IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RYAN BECK,

       Plaintiff,

v.

ALFONSO DAVID, M.D.,
MACHEL REYNOLDS, LPN, and
WEXFORD HEALTH SOURCES, INC.,

       Defendants.

Case No. 3:20-CV-41-NJR

## MEMORANDUM AND ORDER

ROSENSTENGEL, Chief Judge:

Pending before the Court is the Motion for Summary Judgment filed by Defendants Alfonso David, M.D., Machel Reynolds, LPN, and Wexford Health Sources, Inc. ("Wexford"). (Doc. 71). Plaintiff Ryan Beck filed a response in opposition (Doc. 75), and Defendants filed a reply (Doc. 80). For the reasons set forth below, Defendants' motion is granted in part and denied in part.

### FACTUAL BACKGROUND

Plaintiff Ryan Beck, an inmate of the Illinois Department of Corrections, filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging Defendants violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical needs. (*See* Docs. 1, 11). Specifically, Beck alleges that Dr. David and Reynolds were deliberately indifferent in the treatment of his left knee injury and that Wexford was deliberately indifferent by having a policy of denying surgeries for cost purposes. (*Id.*).

During the relevant period, Beck was incarcerated at Shawnee Correctional Center. (Doc. 72-1 at p. 44). Wexford contracted with the State of Illinois to provide certain medical

services to inmates. (*See* Doc. 72 at p. 2). Wexford employed Dr. David as the Medical Director at Shawnee and Reynolds as a Licensed Practical Nurse. (*See id.*).

On January 19, 2018, prior to his incarceration at Shawnee, Beck complained of severe pain in his left knee and received medical care from Dr. Gregory Schierer, an orthopedic surgeon. (Doc. 78-2 at p. 18-19). Dr. Schierer ordered an MRI and a follow-up consultation, which both occurred in February 2018. (*Id.* at pp. 15-20). During Beck's follow-up consultation, Dr. Schierer noted that the MRI showed pigmented villonodular synovitis[1] with a popliteal cyst[2] in his left knee along with "possible meniscus tears." (*Id.* at p. 15). Dr. Schierer scheduled a knee arthroscopy for Beck on March 8, 2018. (*Id.* at p. 17). Beck canceled his procedure due to a skin eruption, but it was rescheduled for June 4, 2018. (*Id.* at p. 12-14). The June procedure also was canceled, either due to problems with Beck's insurance or a conflict with a court date. (*Id.* at 28; Doc. 72-1 at p. 29-30). Beck reported at a later medical exam while in prison that he was supposed to have the surgery on September 11, 2018, but that he was arrested on September 7, 2018. (Doc. 75-3 at p. 39). Beck did not receive surgical treatment before his arrest. (Doc. 72-1 at p. 32).

---

[1] "Pigmented villonodular synovitis (PVNS) is a condition that causes the synovium—the thin layer of tissue that lines the joints and tendons—to thicken and overgrow. The mass or tumor that results from this overgrowth is not cancerous and does not spread (metastasize) to other areas of the body. However, PVNS is a progressive disease. It slowly worsens and can lead to  bone damage and arthritis." *Pigmented Villonodular Synovitis*, AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS, https://orthoinfo.aaos.org/en/diseases--conditions/pigmented-villonodular-synovitis/ (last visited Oct. 18, 2023).

[2] Popliteal cysts, also known as Baker's cysts, are fluid-filled cysts that form a lump at the back of the knee. *Baker's Cyst (Popliteal Cyst)*, AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS, https://orthoinfo.aaos.org/en/diseases--conditions/bakers-cyst-popliteal-cyst/#:~:text=Diseases%20 %26%20Conditions-,Baker's%20Cyst%20(Popliteal%20Cyst),often%20causes%20stiffness%20and%20 discomfort. (last visited Oct. 18, 2023). One of the most common disorders in the knee, popliteal cysts result from a problem inside the knee joint, such as osteoarthritis or a meniscus tear. *Id.* These conditions cause the joint to produce excess fluid, which can lead to cyst formation. *Id.*

On September 8, 2018, Beck was incarcerated at Rock Island County Jail. (Doc. 78-4 at p. 38). In February 2019, while still in custody at Rock Island, a physician evaluated Beck. (*Id.* at p. 39). Beck reported chronic knee pain with swelling since 2012 and recounted the scheduled surgeries. (*Id.*). The physician determined that Beck had pigmented villonodular synovitis and a knee effusion. (*Id.*). The physician also noted that Beck's left knee was slightly swollen. (*Id.*).

On March 7, 2019, Beck was transferred to Stateville Correctional Center. (Doc. 78-6 at p. 2). Immediately upon transfer, a nurse populated an Offender Medical History report, which indicated that Beck had a left knee brace and needed an urgent physical examination. (Doc. 78-4 at p. 11-12). Beck underwent a physical examination that same day. (*Id.* at p. 13-14). The treating physician indicated on the report that Beck had left knee arthritis and his left knee was swollen. (*Id.*). The treating physician prescribed Motrin 400 mg to be taken twice a day and issued Beck a low bunk permit for "left knee trauma." (*Id.*).

Shortly thereafter, Beck was transferred from Stateville to Shawnee. (Doc. 78-6 at p. 2). As part of the transfer, Stateville filed an Offender Health Status Transfer Summary for Beck's medical records, noting that he had left knee arthritis, a left knee brace, and a low bunk permit. (Doc. 78-4 at p. 15). Defendants had access to this summary as well as the Stateville medical records while Beck was under their care at Shawnee. (Doc. 78-5 at p. 126, 135-36).

<u>Beck's Attempts to Secure a Physician Consultation</u>

Upon Beck's arrival at Shawnee, an intake nurse noted that Beck had psoriasis but wrote "zero" for assistive devices or ADA needs. (Doc. 72-4 at p. 6). Still, Beck testified that he was allowed to keep his existing knee brace. (Doc. 72-1 at p. 48). Beck testified that the intake nurse noted his chronic knee problem and advised him that it would be flagged so

that he would be placed on a doctor call line. (*Id.* at p. 48-49, 55-56). Beck testified, however, that he did not see a doctor upon his arrival at Shawnee and had to put in his own sick call instead. (Doc. 72-1 at p. 56).

On March 24, 2019, Beck refused nurse sick call for his skin condition because he did not want to be charged but not see the doctor. (Doc. 72-4 at p. 9, 104). On two other occasions that month, Beck saw both a nurse and a physician for complaints of a rash to his arms, legs, and back. (*Id.* at p. 10-12). There are no documented complaints regarding his left knee during these visits. (*Id.*).

On April 1, 2019, Beck saw a nurse for his left knee pain. (*Id.* at p. 15). At this appointment, the nurse noted that Beck described his knee pain as "constant" and a pain level of 10 on a scale of one to 10. (*Id.*). The nurse noted no signs of obvious discomfort, however, and made no observations related to the affected body part. (*Id.*). Dr. David testified that a patient reporting a pain level of 10 would qualify as "severe discomfort," but that the self-reported pain scale is subjective and must correlate with other findings. (Doc. 78-5 at p. 145). The nurse prescribed ibuprofen 200 mg, one to two tabs, to be taken as needed and did not refer Beck to a physician. (Doc. 72-4 at p. 15).

On April 9, 2019, Beck again sought care for his knee and saw Reynolds for the first time. (*Id.* at p. 16). Reynolds wrote in her report that Beck stated, "I don't have to go to sick call. I see the doctor directly. They told me my knee replacement would be done as soon as I got here from county. I'm not seeing you – I'm seeing the doctor only." (*Id.*). Beck denies making these statements. (Doc. 72-1 at p. 55-57). Beck testified that he "tried to explain to [Reynolds] that this was supposed to be flagged on the intake . . . and that [he] needed to see a doctor." (*Id.*). Beck testified that Reynolds "got really upset with [him]," and that she

threatened him that he "could either sign a refusal [form] and go back to the housing unit, or [he] could just go out to the bull pen and go to seg." (*Id.*). Reynolds noted in her report that Beck signed the refusal form and that he would be seen for follow up in the Health Care Unit ("HCU") as needed. (Doc. 72-4 at p. 16). Reynolds did not refer Beck to a physician. (*Id.*).

The next day, Beck's left knee gave out. (*Id.* at p. 17). Beck testified that "the sergeant called a medical emergency after seeing [his] knee, which was the size of a bowling ball." (Doc. 72-1 at p. 58-60). Beck also testified that when Reynolds saw his knee, she stated "damn, his knee is dislocated." (*Id.*). Beck self-reported that his "knee dislocated when walking downstairs" and that his pain was a level 10 out of 10. (*Id.*). Reynolds observed that Beck had "obvious swelling" and no active range of motion. (*Id.*). Reynolds referred Beck to the physician and prescribed Ibuprofen and an ice pack, instructing him to elevate and stay off his leg. (*Id.*). Beck testified that Reynolds told him "she didn't want her name on none of the paperwork." (*Id.*). Beck also testified that other nurses present gave him the ibuprofen and ice pack. (*Id.*).

The same day, April 10, 2019, Beck saw Dr. David for the first time. (Doc. 78-4 at p. 19-20). Dr. David testified that Beck was brought into the HCU in a wheelchair and reported that he twisted his left knee while walking. (*Id.*). Dr. David observed that Beck's left knee had no discoloration, but he noted soft tissue swelling in the supra-patellar area extending to the lateral side of the knee. (*Id.*). He also observed some tenderness upon palpation, that the patella was in place and was non-tender, and that the knee had slight flexion but was limited. (*Id.*). Dr. David performed the varus stress test, valgus stress test, and Lachman test to assess the integrity of the lateral collateral ligament, medial collateral ligament, and anterior cruciate

ligament, respectively, and all three tests were negative. (*Id.*). Dr. David also observed no muscle atrophy. (*Id.*). He assessed a left knee injury with swelling above the patella. (*Id.*).

Dr. David ordered that Beck remain in the infirmary for 23-hour observation, no weight bearing, use crutches, ice, elevation, and ace wrap. (*Id.*). Dr. David prescribed Motrin 600 mg to be taken three times a day for ten days. (*Id.*). Dr. David also ordered an x-ray of the left knee. (*Id.*).

When he saw Dr. David the next day, April 11, 2019, Beck reported that his knee felt better but he still had pain. (Doc. 72-4 at p. 21). Beck requested Tramadol, a narcotic, rather than Motrin, and explained that he was supposed to have surgery but got incarcerated. (*Id.*). Dr. David observed that Beck was able to put weight on his left leg and had a limp. (*Id.*). He also noted that the preliminary x-ray report showed no fracture or dislocation but soft tissue swelling above the knee. (*Id.*). Dr. David further observed that Beck's left knee had a soft tissue mass laterally on the supra-patella that was non-tender and that there was no deformity of the knee. (*Id.*). Dr. David discontinued the Motrin and prescribed Tramadol 50 mg to be taken twice a day for two months and granted Beck low bunk, low gallery, and crutches permits. (*Id.*). Beck had not received these permits prior to this day while in custody at Shawnee. (Doc. 78-1 at p. 8). Dr. David instructed Beck to continue non-weight bearing activities until further orders. (Doc. 72-4 at p. 21-22). Dr. David discharged Beck from the HCU and noted a follow up once he received the x-ray results and medical records from outside providers. (*Id.*).

The x-ray report stated that Beck had "a large knee joint effusion with fullness of the suprapatellar soft tissues. No convincing evidence of an acute bony fracture is seen radiographically. Please note that that soft tissue injury including ligamentous or meniscal

injury cannot be excluded by radiography alone." (*Id.* at p. 36). Dr. David testified that he relies on the radiologist's interpretation of x-rays and does not feel comfortable giving a medical opinion or diagnosis based on his own review of a radiological image. (Doc. 78-5 at p. 16-19).

<u>Beck's Attempts to Secure Orthopedic Referral</u>

On April 15, 2019, Dr. David submitted an orthopedic consultation referral request to Wexford's collegial review. (*Id.* at p. 24). Wexford generated a written report to Dr. David denying the request due to insufficient information. (Doc. 78-8 at p. 2). Wexford wanted first to review all of Beck's medical records before reaching a decision. (*Id.*).

On April 18, 2019, a nurse noted that Beck's follow up with Dr. David was rescheduled because they had not yet received the x-ray results and outside records. (Doc. 72-4 at p. 24). On April 20 and 22, 2019, Beck refused nurse sick call. (*Id.* at p. 107-08).

On April 22, 2029, Beck saw Dr. David for a follow up after receiving the x-ray results. (*Id.* at p. 25-26). Dr. David explained the results and the collegial review decision to Beck. (*Id.*). Dr. David observed that Beck ambulated with a slight limp and that the left knee had a non-tender soft tissue mass on the lateral aspect of the supra-patella area with large effusion. (*Id.*). Dr. David assessed degenerative joint disease, or arthritis, of the left knee with effusion, and he advised Beck that they were waiting for orthopedic consultation approval. (*Id.*). He also prescribed cream for Beck's psoriasis. (*Id.*).

On May 3, 2019, Beck visited a non-party nurse and complained of left knee pain at a level 10 out of 10. (*Id.* at p. 29). The nurse observed that Beck was walking with a limp. (*Id.*). The nurse noted that Beck had a crutches permit, but he arrived at the HCU with no crutches. (*Id.*). Beck self-reported that the crutches were too small and could not be adjusted, so the

nurse explained that he needed to bring them back to the HCU to be exchanged for the appropriate size. (*Id.*). Beck requested to increase his dosage of Tramadol and claimed needing "better meds than what's offered." (*Id.*). The nurse provided Beck with ibuprofen but did not refer him to a physician. (*Id.*).

On May 8, 2019, the request for Beck's outside medical records had to be renewed after medical staff at Shawnee learned that the original authorization form, faxed April 23, 2019, had not been received. (*Id.* at p. 30). A few days later, Beck asked for his crutches and low gallery restriction to be discontinued. (*Id.*). A nurse informed Beck she would write a note to Dr. David because she cannot discontinue orders without a physician's approval. (*Id.*).

Dr. David submitted another referral request for an orthopedic evaluation to Wexford a few days later, this time with Beck's outside medical records, which included the earlier recommendation from Dr. Schierer for knee surgery. (*Id.* at p. 31).

The following day, Beck saw a nurse, again requesting that his crutches and low gallery restriction be discontinued. (*Id.*). Beck also requested to have his pain medications increased. (*Id.*). The nurse informed Beck that she cannot discontinue orders without the physician's approval. (*Id.*). Beck testified that he did not request to have his low gallery and crutches permits discontinued, but that prison officials "took the crutches from [him] for some reason." (Doc. 72-1 at p. 72-76).

Wexford did not approve the second request for an orthopedic referral. (Doc. 72-4 at p. 32). And, unlike for the first collegial review request, Wexford did not prepare a memorandum explaining the rationale to deny the orthopedic referral for Beck. (Doc. 78-9 at p. 115). The Utilization Management Guidelines for collegial review state that "a recommendation for care will result from [the discussion about an appropriate treatment

plan] and a written response will be provided to the Site Medical Director within five (5) business days after the submission of the request." (Doc. 75-6 at p. 11).

Internal records indicate that Wexford denied the referral after reviewing Beck's prior medical records and seeing that Beck canceled his arthroscopy surgery twice with no follow up. (Doc. 78-8 at p. 3). These internal records also indicate that Wexford relied on an evaluation on April 19, 2019, from a "Dr. Santos" who concluded that Beck was "much improved" and that Beck "refuses to use crutches as direct[ed] and asked to have them discontinued." (*Id.*). Dr. Neil Fisher, M.D., Wexford's corporate representative, testified that there are no medical records indicating Beck was examined on April 19, 2019. (Doc. 78-9 at p. 51-52, 57-60). When asked about the identity of Dr. Santos, Dr. David testified that he does not have "any idea" and that if a Dr. Santos ever evaluated Beck, some record of it would exist in Beck's medical files. (Doc. 78-5 at p. 196-97). Dr. Fisher testified that he "believe[d] that this is [a typographical] error done by the utilization management nurse" and that it likely referred to Dr. David's evaluation on a different date, possibly April 22, 2019. (Doc. 78-9 at p. 67).

<u>Beck's Alternative Treatment Plan</u>

Instead of approving the orthopedic referral request, Wexford prescribed an Alternative Treatment Plan ("ATP") to have Beck use Tramadol and to "follow up in 6 months or as needed." (*Id.* at p. 32, 72). Dr. David testified that Wexford developed the ATP without his participation and without examining Beck. (Doc. 78-5 at p. 77-79, 158-59). The collegial review guidelines state that "[d]uring collegial review, both the Site Medical Director and the Consult Coordinator/Site Scheduler need to be present. The Site Medical Director may choose to have another personnel present during the Collegial Review."

(Doc. 75-6 at p. 6). Dr. David testified that a collegial review call took place that day because he wrote "discussed in Col. Rev." in his notes. (Doc. 78-5 at p. 216-17). Dr. David testified that he "didn't really have any concern about [Wexford's] decision" and that he thought the ATP was "reasonable." (*Id.* at p. 77-79, 158-59). Dr. David testified that he has no particular expertise with orthopedics. (Doc. 78-5 at p. 15).

Dr. Fisher testified on behalf of Wexford that MRIs are more expensive than x-rays. (Doc. 78-9 at p. 185-86). He also testified that Tramadol "costs pennies per dose." (*Id.* at p. 187).

On June 22, 2019, Beck saw Reynolds and requested that his prescription and low bunk/low gallery permits be renewed. (Doc. 72-4 at p. 41). Reynolds noted that Beck's Tramadol prescription expired on June 11, 2019, and she flagged Beck's chart for the doctor to review orders. (*Id.*). On June 26, 2019, Dr. David performed a chart review and prescribed Tramadol 50 mg to be taken twice a day for two months and a low bunk permit for two months. (*Id.* at p. 43, 113).

On July 18, 2019, Reynolds noted that Beck was called to the HCU multiple times for nurse sick call but did not show up. (*Id.* at p. 46). Reynolds testified that her understanding was that security attempted to retrieve Beck for his scheduled visit multiple times, but he never presented. (Doc. 72-3 at p. 72-74). On the other hand, Beck testified that he "remember[s] being in the waiting room," and Reynolds told him "she was going to put [him] on the list to see the doctor." (Doc. 72-1 at p. 92-93). Beck also testified that his "vitals were never taken" but that Reynolds said she would flag his chart and he could go back to his cellhouse. (*Id.*). Reynolds testified that she would have charted if she spoke with Beck and flagged the chart for the doctor, as is her custom and practice. (Doc. 72-3 at p. 75, 118).

On July 28, 2019, Beck saw a nurse and complained of left knee pain. (Doc. 72-4 at p. 46-49). Beck demanded he get his crutches back and some pain medications. (*Id.*). Beck also stated that he was tired of not getting to see the doctor. (*Id.*). The nurse informed Beck that a protocol for his knee pain would be completed and that he could get Tylenol or ibuprofen and an ice pack. (*Id.*). The nurse requested that Beck sign a co-pay voucher and Beck said, "I don't get charged for nothing. I want to see the doctor." (*Id.*). Beck then used expletives as he walked out of the nurse sick call room and would not sign a nurse sick call refusal form. (*Id.*).

Beck tripped over the lip of the shower floor and fell on his knee on August 1, 2019. (Doc. 2-1 at p. 97). Beck saw Reynolds and told her: "You're gonna let me see the fucking doctor today. I fell in the fucking shower and hurt my knee." Reynolds asked Beck why he fell, and he said, "You stupid bitch you know why I fell I got a fucked up knee." Reynolds explained that she had to rule out a fainting episode and Beck yelled, "That's not my MO you stupid bitch. You know what my issues are." Reynolds asked Beck to pull up his pant leg and she observed no change to his knee from the last time she saw him. Beck said, "Bitch you're fucking dumb, this doesn't look the same. I have grievances against you and now I'm going to file a civil suit. Fuck you." (Doc. 72-4 at p. 49-50). A correctional officer removed him from the room. (*Id.*).

Beck disputes this version of events. Beck testified that Reynolds called him a liar and only looked at his knee through his pants because he could not fit his pant leg over his knee. (*Id.* at p. 98-99). Beck also testified that he "never really talked to her crazy the way she said [he] did" and a correctional officer did not remove him. (*Id.* at p. 98-101). Instead, he was already walking out when the correctional officer told him to have a seat. (*Id.* at p. 101).

Reynolds wrote Beck a disciplinary ticket as a result of the interaction. (Doc. 72-6). The Adjustment Committee adjudicated Beck guilty of Intimidation or Threats and Insolence, and he was sentenced to one month of segregation. (*Id.*).

On August 26, 2019, Dr. David renewed Beck's Tramadol prescription and ordered another x-ray. (Doc. 72-4 at p. 54). The x-ray showed tricompartmental osteoarthritis in the knee joint and a large joint knee effusion, but no definite evidence of an acute bony fracture. (*Id.* at p. 102).

On September 19, 2019, Beck saw Dr. David for his left knee pain. (*Id.* at p. 56-57). Dr. David observed an antalgic gait and a swollen left knee that was not red or tender with a large soft tissue mass on the lateral suprapatellar area with no crepitus. (*Id.*). Dr. David advised Beck to continue the Tramadol 50 mg to be taken twice a day for three months as well as Naproxen 500 mg to be taken twice daily for three months. (*Id.*). He also ordered a one-month follow up. (*Id.*). Beck testified that he did not believe he took the Naproxen because he previously had bad experiences with the medication due to his skin condition. (Doc. 72-1 at p. 107-08).

Beck requested an increase of Tramadol in September 2019 because it wears off at night. (Doc. 72-4 at p. 58). Dr. David cautioned Beck about Tramadol's addictive nature as a narcotic, but he prescribed Tramadol 50 mg to be taken in the morning and 100 mg to be taken at night for three months. (*Id.*). Dr. David testified that osteoarthritis has exacerbations and improvement, so he was adjusting the medication based on Beck's subjective statements that the previous pain medication dosage was not sufficient to control his pain. (Doc. 78-5 at p. 189-90).

On October 9, 2019, Beck saw a nurse and requested a renewal of his low bunk permit. (Doc. 72-4 at p. 59). The nurse flagged his chart for Dr. David's review. (*Id.*). Dr. David authorized a one-year permit on October 14, 2019. (*Id.* at p. 120).

Beck again sought an increase in Tramadol in November 2019. (*Id.* at p. 62). A nurse observed that Beck's left knee was swollen and he had difficulty walking and rising from his chair. (*Id.*). She referred him to a physician. (*Id.*).

On November 18, 2019, Beck saw a non-party doctor for a follow-up on his ATP. (*Id.* at p. 66). The doctor observed that Beck's left knee was swollen but did not refer him for further evaluation despite having the authority to do so. (*Id.*). Beck testified that the doctor examined his left knee and told him he should not be taking any pain medications. (Doc. 72-1 at p. 117).

In December 2019, Dr. David again ordered Tramadol 50 mg to be taken in the morning and 100 mg to be taken at night for three months. (Doc. 72-4 at p. 69). Beck saw Reynolds on January 5, 2020, seeking more Tramadol. Reynolds told Beck that he just had an increase and to allow more time for it to work. (*Id.*). She advised him to try Tylenol. (*Id.*).

On January 23, 2020, after he filed this lawsuit, Beck saw Dr. David and reported that he was doing "OK" with his knee pain controlled by Tramadol. (*Id.* at p. 70). Dr. David noted that the physical examination was the same and his assessment was tricompartmental osteoarthritis of the knee. (*Id.*). He advised Beck to continue his medications and follow up as needed. (*Id.*).

Wexford never authorized an orthopedic referral to address Beck's knee condition. (*See* Doc. 78-1 at p. 17). After Dr. David's two referrals were denied in collegial review, he did not pursue a third referral or otherwise appeal the denials. (*Id.* at p. 16). Dr. David also did

not order an MRI to evaluate Beck's left knee. (*See id.* at p. 12). Dr. David testified that, in his opinion, it was not medically necessary to refer Beck to the orthopedic specialist or for an MRI after the April 2019 referral because it was his impression that Beck's symptoms resulted from his osteoarthritis. (Doc. 78-5 at p. 175-76, 193).

On January 10, 2020, Beck filed this lawsuit. (Doc. 1). After preliminary review of Beck's Complaint pursuant to 28 U.S.C. § 1915A, he is proceeding on two counts:

> **Count 1:** Machel Reynolds and Dr. Alfonso David were deliberately indifferent under the Eighth Amendment in the treatment of Plaintiff's knee injury.

> **Count 2:** Wexford Health Services, Inc. was deliberately indifferent under the Eighth Amendment by having a policy of denying surgeries for cost purposes.

### LEGAL STANDARD

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). *See also Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 841 (7th Cir. 2004).

Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e). *See also Celotex*, 477 U.S. at 232-24. In determining whether a genuine issue of fact exists, the Court must view the

evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "inferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

### DISCUSSION

The Eighth Amendment prohibits cruel and unusual punishment, and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately, that is subjectively, indifferent to that condition. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citation omitted). It is not necessary for a condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") (internal quotation marks omitted) (emphasis added).

Prevailing on the second prong requires a plaintiff to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id.* at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual knew of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, at 409 (7th Cir. 2014). Most deliberate indifference claims rely on circumstantial evidence. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Circumstances that permit a jury to find deliberate indifference include complete denial of medical care, delay of care, a continued course of ineffective treatment, a substantial departure from accepted professional practice, ignoring an obvious risk, and refusing to provide care because of cost. *Id.* (collecting cases).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit Court of Appeals has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit the claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

I.     **Count 1 – Deliberate Indifference as to Reynolds**

Reynolds has moved for summary judgment on Beck's claim that she was deliberately indifferent to his knee condition. (*See* Doc. 72). There is no dispute that Beck suffered from an objectively serious medical condition or that Reynolds knew of that condition. Thus, the only question is whether Reynolds was deliberately indifferent to Beck's condition—*i.e.*, whether she knowingly or recklessly disregarded it.

Based on the summary judgment record, a reasonable jury could conclude that Reynolds was deliberately indifferent to Beck's knee condition. There is a question of fact as to whether Reynolds denied or delayed Beck's medical treatment when he sought care for his knee on April 9, 2019. Although Reynolds wrote in Beck's medical records that Beck refused nurse sick call and said, "I don't have to go to sick call . . . I see the doctor directly," Beck testified that he did not refuse nurse sick call and instead "tried to explain to her that this was supposed to be flagged on the intake . . . and that [he] needed to see a doctor." (Doc. 72-4 at p. 16; Doc. 72-1 at p. 55-57). Beck also testified that Reynolds threatened him with segregation if he did not sign the sick call refusal form. A jury crediting Beck's testimony could find that he tried to seek medical care, but that Reynolds denied him treatment.

There is also a question of fact as to whether Reynolds delayed or denied treatment by intentionally misleading Beck to believe he was placed on the "doctor's list" on July 18, 2019. Beck testified that he was in the waiting room that day when Reynolds told him she would put him in to see the doctor. She then told him he could return to his cellhouse. But Reynolds noted in Beck's records that he did not show up for sick call that day. Again, a jury crediting Beck's version of events could find that Reynolds intentionally misled Beck to

believe he was being placed on the doctor's list and did not require a consultation that day, thereby delaying or denying him medical care.

Finally, a reasonable jury could conclude that Reynolds denied or delayed Beck's medical care when she did not examine his knee or otherwise treat it on August 1, 2019, after Beck fell in the shower. Reynolds testified that Beck swore at her and became angry and hostile, even though she examined his knee and found no changes to it other than swelling. Beck testified, however, that he did not use profanity toward Reynolds, she refused to look at his knee, and she just wanted him to go to segregation in retaliation for grievances he filed against her.

This Court cannot "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true" and instead must only "decide, based on the evidence in the record, whether there is any material dispute of fact that requires a trial." *White v. Woods*, 48 F.4th 853, 861 (7th Cir. 2022). Because the Court finds there are outstanding questions of material fact as to whether Reynolds denied or delayed care for Beck's knee condition, Reynolds is not entitled to summary judgment.

## II.      Count 1 - Deliberate Indifference as to Dr. David

Dr. David argues that he is entitled to summary judgment on Beck's claim of deliberate indifference regarding his knee condition. Specifically, Dr. David argues that Beck cannot produce competent medical evidence that his treatment decisions demonstrated "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties*, 836 F.3d at 729. Dr. David asserts that he is entitled to summary judgment because (1) he referred Beck for an orthopedic referral; and (2) after he reviewed Beck's outside

orthopedic records, he agreed with the ATP to treat Beck conservatively onsite and to re-present if needed. (Doc. 72 at p. 21). Dr. David argues that his professional opinion was based on the totality of his evaluation and Beck's history, complaints, and prior records. (*Id.*).

In response, Beck argues that he arrived at Shawnee with a serious, objective medical need: an orthopedic surgeon had previously conducted an MRI and concluded that Beck should have knee surgery. (Doc. 78-1 at p. 18). After repeatedly requesting a medical consultation with a doctor for three weeks, Beck saw Dr. David, the Medical Director at Shawnee. (*See* Doc. 72-4 at p. 17; Doc. 72 at p. 2). Beck argues that although Dr. David initially ordered an x-ray and thereafter submitted two orthopedic referrals to Wexford, Dr. David was deliberately indifferent when he continued a course of ineffective treatment. (*See* Doc. 78-1 at p. 19).

Simply put, the Court disagrees with Beck. Based on the evidence in the record, no reasonable jury could conclude that Dr. David was deliberately indifferent to Beck's knee injury. (*See* Doc. 78-5 at p. 15).

Beck first argues that Dr. David did not see him until three weeks after he arrived at Shawnee, despite his repeated requests for a consultation with a doctor. Beck has presented no evidence, however, that Dr. David refused to see Beck in those three weeks or that Dr. David was otherwise personally responsible for the delay in Beck seeing a doctor. Beck makes much of the fact that Dr. David did not consult with Beck upon his transfer to Shawnee, despite his name being printed on a "Consent for Medical Treatment" form. Dr. David explained, however, that the form is given to inmates by nurses as part of their protocol for new prisoners, and Beck has pointed to no evidence showing that Dr. David was required to

meet with Beck at intake. He also has failed to explain, whatsoever, how this alleged failure constitutes deliberate indifference.

Turning to the care Dr. David provided, when Dr. David first saw Beck on April 10, 2019, he examined Beck's knee, noted some tenderness and swelling, and performed various tests to assess the integrity of Beck's LCL, MCL, and ACL. When those tests came back negative, he assessed a left knee injury with swelling above the patella. (*Id.*). Dr. David ordered treatment including a 23-hour observation, crutches, elevation, ice, and an ace wrap. He also prescribed Motrin 600 mg and ordered an x-ray.

The very next day, when Beck reported feeling better but that he still had pain, Dr. David discontinued the Motrin and prescribed Tramadol, a powerful opioid pain reliever. Dr. David also granted Beck low bunk, low gallery, and crutches permits. While Dr. David did not order an MRI, he did request an orthopedic referral on April 15, 2019, which was denied by Wexford due to insufficient information. Once he obtained the requested information, Dr. David submitted another referral request on May 13, 2019.

These actions are not evidence of deliberate indifference. Instead, they show Dr. David's persistent efforts to treat Beck, diagnose his injury, determine the source of his pain, and obtain an orthopedic referral. While Beck argues that Dr. David should have insisted on participating in the collegial review process at Wexford or otherwise appeal the referral denials, Dr. David testified that after the referral was denied, he did not believe that an orthopedic specialist evaluation or MRI was medically necessary because it was his impression that Beck's symptoms were more due to his osteoarthritis and the benign pigmented nodular synovitis. (Doc. 72-2 at p. 28).

Because Dr. David's decision not to request an MRI or to further seek a referral to an orthopedic specialist was based on his professional medical judgment, no reasonable jury could find him deliberately indifferent to Beck's left knee condition. *See Whiting*, 839 F.3d at 662. Furthermore, it is insignificant that Dr. David has no specialized training in orthopedics; "the prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012).

Moreover, the medical records indicate that Dr. David saw Beck at least five times for his knee pain between April 10, 2019, and January 23, 2020. Each time, Dr. David addressed Beck's concerns by renewing and even increasing his Tramadol prescription, renewing his permits, and twice requesting an orthopedic consultation. While Beck claims that his Tramadol prescription ran out while he was on a court writ, Dr. David testified that the patient has responsibility to request an extension of their medication, as powerful pain medications are not prescribed indefinitely. (Doc. 72-2 at p. 25). Additionally, although Beck claims that the ATP was ineffectual and that Dr. David continued in a treatment regime that did not improve his medical condition, there is no evidence in the medical records that Beck ever requested anything other than additional pain medication after Wexford denied the orthopedic consultation. Dr. David increased Beck's Tramadol dosage as needed, and, on January 23, 2020, Beck reported that he was doing "OK" and that his knee pain was controlled by the Tramadol. While Beck may ultimately disagree with Dr. David's decision to follow the ATP, that disagreement does not mount to deliberate indifference. *Snipes v. DeTella*, 95 F.3d

586, 591 (7th Cir. 1996) ("A prisoner's dissatisfaction with a physician's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.").

A reasonable jury considering the summary judgment evidence could not find that Dr. David was deliberately indifferent. Accordingly, he is entitled to summary judgment.

## III.    Count 2 – Deliberate Indifference as to Wexford

In Count 2, Beck asserts Wexford had a policy of denying surgeries for cost purposes.

While Wexford is a private corporation, the Seventh Circuit has held that a private company that has contracted to provide essential government services, such as health care for prisoners, can be held liable if the constitutional violation was caused by an unconstitutional policy, practice, or custom of the corporation itself. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). To support a claim under 42 U.S.C. § 1983 on this theory, a plaintiff must show: (1) the corporation's practice violated his constitutional rights; and (2) the practice was "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* "This requires more than a showing of one or two missteps." *Id.* (quotation omitted). There must be "systemic and gross deficiencies," of which policymakers were aware and failed to correct them, thereby "manifesting deliberate indifference." *Id.*

Beck argues that when he arrived at Shawnee, he had an "unrebutted" recommendation from an orthopedic surgeon for surgery to address his left knee. Wexford, through its representatives, then ignored that recommendation and instead opted for the ATP. In doing so, Wexford relied on an x-ray, which would be cheaper than an MRI

performed off site. Furthermore, in denying Dr. David's orthopedic referrals, Beck argues, Wexford "failed to follow its own internal protocol" because Dr. David did not participate in the collegial review process. Beck also asserts there is no evidence that Wexford filed a written response to Dr. David per its guidelines. Beck avers that the orthopedic consultation denial resulted from Wexford's failure to follow its express policies for collegial review, which in turn resulted in a less expensive ATP. (*Id.*).

Not only has Beck failed to explain how the failure to follow internal protocols amounts to a violation of his Eighth Amendment rights, but he also has not pointed to a policy or widespread practice that led to a delay or denial of treatment. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021). In *Dean*, the Seventh Circuit Court of Appeals held, as it has many times before, that a plaintiff "seeking to hold a municipality liable for a facially lawful policy" must provide proof of more than just a single incident "to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985)). The rationale for requiring a pattern of similar violations is that it "puts the municipality on notice of the unconstitutional consequences of its policy, such that its continued adherence to the policy might establish the conscious disregard for the consequences of its action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407–08 (1997) (cleaned up)). A pattern of violations also may demonstrate that the policy itself is the moving force behind the plaintiff's injury rather than a single negligent action. *See id.*

Although the evidence, construed in the light most favorable to Beck, suggests that Wexford may not have followed its Utilization Management guidelines for collegial review,

Wexford's failure to follow its protocols does not, on its own, serve as an independent basis for a constitutional claim. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). Beck also has offered no evidence that Wexford had an express policy or widespread practice of failing to follow the collegial review process or that doing so led to less expensive treatment plans. Because Beck has not shown "more than the deficiencies specific to his own experience," he has failed to establish that any Wexford policy was the moving force behind his injury. *Daniel v. Cook Cnty.*, 833 F.3d 728, 735 (7th Cir. 2016); *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020). Accordingly, Wexford is entitled to summary judgment.

CONCLUSION

For these reasons, the Motion for Summary Judgment filed by Defendants Alfonso David, M.D., Machel Reynolds, LPN, and Wexford Health Sources, Inc. (Doc. 71) is **GRANTED in part and DENIED in part**.

Defendants Dr. Alfonso David and Wexford Health Sources, Inc. are **GRANTED** judgment as a matter of law and are **DISMISSED with prejudice**.

Beck shall proceed to trial on his claim of Eighth Amendment deliberate indifference against Defendant Machel Reynolds. A status conference will be set by separate order to discuss a potential referral to mediation and to select a firm trial date.

**IT IS SO ORDERED.**

**DATED:   October 19, 2023**

**s/ Nancy J. Rosenstengel**
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**